IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WIOLETTA WALKO, )
)
Plaintiff, )
)
v. ) NO. 04 C 3113
)
ACADEMY OF BUSINESS & CAREER )
DEVELOPMENT, LLC, et al., )
)
Defendants. )

MEMORANDUM OPINION AND ORDER

Wioletta Walko ("Walko") has charged her former employer, Academy of Business & Career Development, LLC. ("Academy"), with two violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e to 2000e-17: sexual harassment and retaliation. Academy has moved for summary judgment on both of those claims under Fed. R. Civ. P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Academy's motion is denied.[1]

Summary Judgment Standards

Familiar Rule 56 principles impose on Academy the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must consider the evidentiary record in the light most favorable to nonmovant Walko and draw all reasonable inferences in her favor (Lesch v. Crown Cork & Seal

---

[1] With no motion having been submitted as to Walko's claims against codefendant Kris Sarnecki, this opinion deals only with her status vis-a-vis Academy.

Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment Walko must produce "more than a mere scintilla of evidence to support h[er] position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.).

It may no longer be accurate to say, as did Miller v. Borden, 168 F.3d 308, 312 (7th Cir. 1999), that the summary judgment standard is "applied with added rigor" in employment discrimination cases, where intent is inevitably the central issue (in that respect see Alexander v. Wis. Dep't of Health & Family Servs., 263 F.3d 673, 680-81 (7th Cir. 2001)). But whatever the appropriate locution, the potential for summary judgment certainly exists where a movant plainly satisfies the Rule 56 standard. If the record were to reveal that no reasonable jury could find in favor of Walko, summary judgment would be granted (see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

To evaluate that possibility, what follows is a summary of the facts, viewed of course in the light most favorable to nonmovant Walko under the criteria prescribed by Rule 56 and this District Court's LR 56.1.[2] And that of course obviates the need

---

[2] LR 56.1 implements Rule 56 by requiring the parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon.

2

to repeat "according to Walko" or the like, or to identify any conflicting account, though the latter is sometimes included for purely informational purposes.

## Background

Walko was born in Poland and has lived in Chicago since February 1996 (A. St. ¶7). In the summer of 1996 she began working as a teacher in the summer camp of Interclub, Inc. ("Interclub")(W. Dep. 7-8).[3] At that time Walko met Kris Sarnecki ("Sarnecki"), the President and owner of Interclub (A. St. ¶9). After the end of summer camp, Walko remained on as a teacher until April 2002, when she was promoted by Sarnecki, Thomas Zambrzycki ("Zambrzycki") and Waldemar Warzecha ("Warzecha") to be the principal of the Polish school at Interclub (id. ¶10; W. Dep. 8-9).

In November 2002 Sarnecki sold Interclub's assets to

---

This opinion cites to Academy's statement as "A. St. ¶--," to Walko's response as "W. St. ¶--" and to Walko's statement of additional facts as "W. Add. St. ¶--." Where an assertion in either party's LR 56.1 statement is undisputed by the opponent, the opinion includes only a citation to the original statement. "A." and "W." designations also are used in referring to all other documents submitted by the parties. Finally, for simplicity's sake citations to the witness depositions (cited "Dep.") will abbreviate their names: "W." for Walko, "War." for Waldemar Warzecha and "Z." for Thomas Zambrzycki.

[3] Walko has also brought claims against Interclub--Academy's predecessor--for sexual harassment and retaliation. As Interclub had never entered an appearance or filed a responsive pleading, on September 20, 2004 this Court granted Walko's motion for an order of default against Interclub.

3

Zambrzycki and Warzecha (W. Add. St. ¶1). After the transfer of ownership, Zambrzycki and Warzecha changed the Interclub name to Academy (id. ¶2). Both Sarnecki and Walko continued to work at the newly-named Academy, with Sarnecki serving as a consultant, teacher and apparently as Walko's direct supervisor (A. St. ¶3; Z. Dep. 57-58).[4] In those capacities Sarnecki continued to have input on the operation of the Polish school and met with Zambrzycki and Warzecha to discuss the "more important issues" of the school (W. Add. St. ¶¶6-7). Walko remained as the Polish school principal (id. ¶3).

Also in November 2002, Sarnecki and Walko began to date (id. ¶8). Although that initial relationship appears to have started and stopped in the course of the month, Walko and Sarnecki were flirtatious toward each other well before November. For example, in February 2002 Walko gave Sarnecki a Valentine's Day card, which included a handwritten note stating that she was giving him "a hug and I am kissing you" (A. St. ¶14). And in July 2002

---

[4] There is some conflicting testimony in the record as to who acted as Walko's supervisor following Interclub's sale. In his deposition Zambrzycki claimed that after the transfer of ownership he and Warzecha were Walko's "official supervisors," although Sarnecki still "help[ed] her" and "provid[ed] feedback to her" (Z. Dep. 59-60). In contrast, Academy's LR 56.1 statement said that "at all relevant times up to June 2, 2003 [Sarnecki] was plaintiff's supervisor" (A. St. ¶3)--a statement supported by citation to Walko's unverified Amended Complaint, admissible in this context under Fed. R. Evid. ("Evid. Rule") 801(d)(2)(C) as a nonhearsay admission of a party-opponent. Given the direction in which inferences must be drawn, the version in the text controls.

4

Walko gave Sarnecki a card telling him that she was "sending [him] a little hug" (id. ¶15).

In February and March 2003 Sarnecki and Walko again dated (W. Add. St. ¶8).[5] During that period the two went out to dinner and Walko visited Sarnecki at his condominium "a few times" (A. St. ¶¶23, 24). They hugged and kissed, although their physical relationship did not proceed beyond that (W. Add. St. ¶10). At her deposition Walko said she "did not know" if she ever loved Sarnecki (A. St. ¶26).

At either the end of March or the beginning of April, Walko told Sarnecki she did not want to date him any more because she wanted to date another man, Roman Glogowski (id. 28). At that point Sarnecki began "following" and "watching" Walko (W. Add. St. ¶12). Sarnecki also inquired into Walko's romantic feelings for him, suggested that Walko "engage in sexual relations with him" and sent her love letters, electronic mail and voice messages where he expressed his desire for a physical relationship with her (id. ¶13). When those advances were unsuccessful, Sarnecki's conduct escalated: He threatened Walko that if she did not agree to be with him, she would lose both her

---

[5] Because all of the remaining background events also occurred in 2003, any year references will be omitted as to those events.

5

job and her chance at receiving a green card (id. ¶15).⁶

Academy did not have a sexual harassment policy at any time during Walko's employment (id. ¶16). Nonetheless Walko met with Zambrzycki in April to address the problems she was having with Sarnecki (A. St. ¶29; W. St. ¶29). Zambrzycki's solution was for Walko to avoid Sarnecki by doing work at home and by working different hours from Sarnecki's (A. St. ¶30). Zambrzycki told the staff at the Polish school that if Sarnecki called to speak to Walko, they were to tell Sarnecki that she was not there (id.).

Zambrzycki's proposed solution did little to ameliorate the problem, and on May 7 the conflict between Sarnecki and Walko came to a head. Sarnecki told Walko that she was fired and that "bad things" would happen to her if she attempted to return to work the next day (W. St. ¶¶19, 20). Walko immediately reported to Warzecha that Sarnecki had fired her (id. ¶22). When Warzecha asked Sarnecki if that were true, Sarnecki denied the termination (War. Dep. 57). According to his deposition testimony, Warzecha

---

⁶ Interclub had originally sponsored Walko's immigration petition, which was pending during April 2003. According to Zambrzycki's testimony, he was aware that Sarnecki had threatened to withdraw sponsorship on Walko's petition, and he offered to file a new petition on her behalf under Academy's sponsorship (Z. Dep. 129-30, 181). Though Zambrzycki did not think Sarnecki would actually pull her petition, Zambrzycki testified that he later learned "from the press" that Sarnecki was indicted for attempting to pay a government official to have Walko deported (id. 189-90).

6

responded by telling Sarnecki and Walko to "take a break or don't communicate any longer today. I don't want any problems" (id. 58).

On May 8 Walko hand-delivered a letter to Zambrzycki, addressed to both him and Warzecha, documenting Sarnecki's threats (W. Add. St. ¶¶24, 25; W. Ex. 4). After giving him the letter Walko met with Zambrzycki. Zambrzycki told her that she had to take a three-week vacation using her accrued vacation time (W. Add. St. ¶26). When Walko protested that she did not want to take a vacation (particularly because it was the end of the school year and she needed to finish up her work), Zambrzycki told her she "had no choice" (id.).

Next day (on May 9) Walko's attorney Lynn Shapiro ("Shapiro") mailed a letter to Zambrzycki documenting the threats made by Sarnecki to fire Walko and "put her green card in jeopardy if she refuses to have a relationship with him" (W. Add. St. ¶27; W. Ex. 5). It is unclear just when Academy received the letter, but once it was in hand Zambrzycki and Warzecha were angry because, among other reasons, Sarnecki's and Walko's relationship was affecting their business (W. Add. St. ¶¶28, 29; War. Dep. 71-72). Sarnecki too was angry and, with Zambrzycki's full knowledge, telephoned Shapiro (W. Add. St. ¶31).

On the same day that Shapiro sent the letter documenting Sarnecki's conduct, Walko again met with Zambrzycki to discuss

her status at Academy. At that meeting Zambrzycki told Walko that she would not be coming back to Academy after her vacation (id. ¶33; W. Dep. 82). Zambrzycki added that he was "sorry that he had to lose her this way" and that he had "no other choice" (id.).

Walko met with Warzecha one last time in early June when her three week forced "vacation" had ended. Although Walko and Warzecha offer up differing versions of that meeting (see War. Dep. 81-82, 85-95; W. Dep. 97), Rule 56 requires that Walko's be credited. For present purposes, then, Warzecha fired her during the meeting: He told her that he had no choice and that they could not fire Sarnecki (W. Dep. 97).[7]

Despite Walko's repeated complaints, at no time was any disciplinary action taken by Academy against Sarnecki. Academy never gave him any formal or written warning about his behavior, nor was he ever docked pay, suspended or terminated from the company (W. Add. St. ¶32).

---

[7] Warzecha claims that Walko was not fired at that point--instead he says that he told Walko she should come back to the Polish school but she refused to do so. According to Warzecha, Walko was not fired until August 31 and then only for failing to come in to work (War. Dep. 77, 93-94). But even apart from the Rule 56 mandate to ignore that conflicting account, Warzecha's testimony about his reasons for firing Walko is undercut by his own later statement that if he had not heard about any of Walko's complaints, based on her performance at work, "there is a very good chance she would still be employed" (id. 95-96).

8

Sexual Harassment Claims

Although Walko's Complaint and legal memorandum speak in the parlance of sexual harassment "quid pro quo" and "hostile work environment," the Supreme Court has abandoned those characterizations as controlling, in favor of distinguishing between cases based on whether there was or was not a tangible adverse employment action taken against a complaining employee (Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-54 (1988)).[8] When an employee proves[9] that a tangible adverse employment action (such as termination) has been conjoined with her[10] "refusal to submit to a supervisor's sexual demands...she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII" (id. at 753-54). But for cases of sexual harassment either "preceding the employment decision" or

---

[8] For lack of better terminology, this opinion nevertheless uses the pre-Ellerth labels "quid pro quo" and "hostile work environment" as a convenient way to reflect the distinction outlined in Ellerth.

[9] Although the text speaks about what an employee must "prove" or "establish" or "demonstrate" or the like, those terms merely echo the terminology in the caselaw and are not the standards applied here. This Court has instead applied the appropriate Rule 56 standard, imposing on Walko the lesser burden of identifying a genuine issue of material fact as to the essential elements of her case.

[10] In the circumstances of this case all references will be to a female employee, although of course the relevant principles are not so limited.

where no adverse action has been taken to be actionable, the harassing conduct must have been sufficiently severe or pervasive as to alter the employee's work environment (id. at 754).

Apart from the just-stated distinction, the requirements for establishing prima facie "quid pro quo" or "hostile work environment" claims of sexual harassment are similar: To succeed on either, the employee must demonstrate (1) that she was subject to unwelcome sexual advances or harassment, (2) that the unwelcome advances or harassment were sexually motivated and (3) that there is a basis for employer liability--that is, a respondeat superior link between the employer and the harasser[11] (see, e.g., in "quid pro quo" terms, Bryson v. Chicago State Univ, 96 F.3d 912, 915-16 (7th Cir. 1996), relied on again as recently as in Farfaras v. Citizens Bank & Trust of Chicago, Nos. 05-2082 & 05-2368, 2006 WL 47602, at *5 (7th Cir. Jan. 11), and in "hostile work environment" terms, Rhodes v. Illinois Dep't of

---

[11] In the context of a "quid pro quo" case, employer liability may be imposed because the harasser was the employee's supervisor. If that were not the case, no quid pro quo claim would ordinarily be viable because the harasser would not have the power to take a tangible employment action (B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 152 (1992)). For a "hostile work environment" claim, however, employer liability may result either where the harasser was a supervisor or where the harasser was a co-worker and the company was "negligent either in discovering or remedying the harassment" (Hall v. Bodine Elec. Co., 276 F.3d 345, 356 (7th Cir. 2002)). And in light of Walko's portrayal of events, Academy has understandably not attempted to avail itself of the potential affirmative defense to such a claim.

Transp., 359 F.3d 498, 505 (7th Cir. 2004)).

Academy's motion for summary judgment on Walko's harassment claims contests only her ability to prove up the second factor: that Walko was harassed because of her sex. As the sole support relied on its memorandum,[12] Academy cites to and seeks to analogize Galloway v. Gen. Motors Serv. Parts Operations, 78 F.3d 1164 (7th Cir. 1996), overruled in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)).[13] In Galloway the plaintiff-employee was subjected to a number of offensive acts by her co-worker, a man with whom she had previously been romantically involved (id. at 1165). Those acts, occurring over the course of four years, included her co-worker repeatedly calling her a "sick bitch," once remarking "[i]f you don't want me, bitch, you won't have a damn thing" and once

---

[12] During the most recent (January 22, 2005) status hearing, Academy's counsel cited two additional cases to support its position: Huebschen v. Dep't of Health & Soc. Servs., 716 F.2d 1167, 1172 (7th Cir. 1983) and Trautvetter v. Quick, 916 F.2d 1140, 1151 (7th Cir. 1990). As the later discussion confirms, however, those cases also provide no real support for the position that Academy seeks to advance as to the impact of a prior consensual relationship on a sexual harassment claim.

[13] In response Walko tries to argue that even if Galloway and its attendant analysis of the impact of a prior consensual relationship apply to Walko's "hostile work environment" claim, they do not apply to her "quid pro quo" claim (W. Mem. 8). But there is no reason to treat "quid pro quo" and "hostile work environment" harassment claims differently in this case. Indeed, Huebschen, 716 F.2d at 1172 reached much the same result as Galloway in a "quid pro quo" harassment suit brought under the Equal Protection Clause—again suggesting that the Galloway-type analysis is not limited in the way that Walko contends.

11

making an obscene gesture while telling her to "suck this bitch" (id.). After some extended discussion, Galloway held that the repeated and varied use of the word "bitch" and the other offensive acts were "in context, not...sex- or gender-related" (id. at 1167).

Galloway then went on to say in dictum that "[e]ven if this is wrong and there is some sexual innuendo or gender slur in 'sick bitch'" that the court was missing, the harassment still was not actionable because it fell under the bar created by Baskerville v. Culligan Int'l Co., 50 F.3d 428 (7th Cir. 1995)). As Galloway, 78 F.3d at 1168 explained, in Baskerville:

> [W]e created a safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex. Bullock repeated "sick bitch" to Galloway some indefinite number of times over a period of four years in the context of a failed sexual relationship not contended to have been coerced or to have been otherwise an incident of sexual harassment. The repetition of the term together with the other verbal conduct that is alleged reflected and exacerbated a personal animosity arising out of the failed relationship rather than anything to do with a belief by Bullock, of which there is no evidence, that women do not belong in the work force or are not entitled to equal treatment with male employees.

Academy argues that the finding in that Galloway language should attach here, where assertedly just as in Galloway (1) Walko and Sarnecki had a consensual relationship, (2) after it ended Sarnecki engaged in "undignified" conduct and (3) there is no evidence that Sarnecki sexually harassed anyone else (A. Mem 6-

12

7).

While that dictum in Galloway is relevant to the present analysis, it simply does not call for the conclusion that Academy would like in the totally different scenario presented by this case. To begin with, even under circumstances closer to Galloway (and not comparable to those here) Academy is swimming in muddy waters: There are relatively few such cases, and they are difficult to reconcile--contrast, for example, the opposite conclusions reached in Green v. Adm'rs of the Tulane Educ. Fund, 284 F.3d 642, 656-57 (5th Cir. 2002) and in the nonprecedential opinion in Kaminski v. Freight-A-Ranger, Inc., No. 01-4937, 2002 WL 31174461, at *3-*5 (N.D. Ill. Sept. 30).

At the outset, it is plain that Galloway does not stand for the proposition as a matter of law that an employee cannot recover on a sexual harassment claim merely because she had in the past entered into a consensual relationship with the harasser (see, e.g., Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001); Babcock v. Frank, 729 F. Supp. 279, 288 (S.D. N.Y. 1990)).[14] Indeed, the discussion in Galloway itself

---

[14] Although it makes no difference in the ultimate outcome, it is worth noting that the prior relationship between Walko and Sarnecki was tepid as sexual relationships go and, by contrast, that to term as merely "undignified" Sarnecki's extremely aggressive harassment after Walko had called it quits is an extraordinary understatement. Thus to the extent that the caselaw requirement that an alleged harasser's activity must be unwelcome may reflect a view that invited sexual behavior should be nonactionable, this case is a particularly bad candidate for

13

shows that. If it were really true that a prior relationship created a per se bar to recovery under Title VII for sexual harassment, Galloway could readily have said so, rather than engaging in a lengthy discussion of the non-gendered nature of the term "bitch" and on the limited frequency and severity of the sexual harassment at issue there. And to demonstrate even more conclusively that the snippet of language from Galloway is a weak read on which Academy places too much weight, in the post-Galloway case of Johnson v. West, 218 F.3d 725, 7th Cir. 2000) our Court of Appeals made it plain that even if the employee-victim and the supervisor-harasser had earlier been involved in a consensual relationship, that does not excuse the harassment that the victim endured once that relationship was dissolved.

It cannot be gainsaid that at least under circumstances such as those presented here, the universal rule that Academy seeks to draw out of Galloway is not only at war with Ellerth's teaching but is truly outrageous as a matter of principle.[15] As Perks v. Town of Huntington, 251 F. Supp.2d 1143, 1157 (E.D. N.Y. 2003) has explained:

> Boiled down to its essence, [that] argument would mean that once a supervisor has engaged in a consensual relationship with an employee, he subsequently has carte blanche to harass that employee with impunity, even though the same

applying any such notion.

[15] It is also worth observing that Judge Posner, author of the Galloway opinion, was a member of the Johnson panel.

14

behavior with respect to any other employee would constitute a Title VII violation.

Rather than creating a bright line rule prohibiting recovery, Galloway simply acknowledges that the prior relationship between the harasser and the victim is a factor to consider in analyzing whether the discrimination was based on sex (see Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1188 (11th Cir. 2001)). Its import in each case, however, will turn on the particular facts of that case.

As already stated, the few cases in this area are not consistent in their analyses or outcomes. Caselaw has, however, offered two possible ways in which plaintiff-employees can raise an inference (or in the language of summary judgment, a genuine issue of material fact) that gender--rather than personal animosity--motivated the harasser.

First, Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) teaches that where the harassment at issue is sexual in nature, there is a reasonable inference that the harassment was based on the victim's sex:[16]

---

[16] Galloway also may support such an inference (or at least allow for it), for it looked first to the offending conduct to determine whether it was sex-related (78 F.3d at 1167-68) before discussing the fact that the two parties in that case had a prior existing relationship. And such an inference follows from Trautvetter, 916 F.2d at 1151 as well, for it expressly held that in order to separate out sex-based discrimination from personal animosity-based discrimination, courts should engage in "a careful analysis of the conduct which is alleged to be harassment." In that latter respect, it is also worth noting

15

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.

And importantly for this case, that same inference has been applied to instances where the harasser and victim had a pre-existing relationship (see Lipphardt, 267 F.3d at 1189; Oakstone v. Postmaster Gen., 323 F. Supp.2d 261, 270-71 (D. Me. 2004)).[17] Second, an employee also might be able to raise an inference that the harasser was motivated by the employee's sex by showing that the harasser discriminated against or made advances toward other

---

that Trautvetter was addressing the really different issue of an equal protection claim, where by definition the singling out of an individual woman as a target did not support a class-based animus.

[17] Although Lipphardt involved a claim for retaliation, the court contrasted that case with a "hostile work environment" case (Succar v. Dade County Sch. Bd., 229 F.3d 1343 (11th Cir. 2000) (per curiam)), analyzing whether the employee had an objective belief that she was the victim of harassment. Lipphardt distinguished the two cases, noting that the conduct at issue in its case was sexual in nature while the harassment in Succar was not. Lipphardt, 267 F.3d at 1189 (citation and internal punctuation omitted) further explained:

> When a person "sexually harasses" another, i.e., makes comments or advances of an erotic or sexual nature, we infer that the harasser is making advances toward the victim because the victim is a member of the gender the harasser prefers...[U]nless there is evidence to the contrary,...we also infer that the harasser treats members of the "non-preferred" gender differently--and thus that the harasser harbors an impermissible discriminatory animus towards persons of the preferred gender.

16

employees of the same sex as plaintiff (see Huebschen, 716 F.2d at 1172).

In terms of Walko's case, there is no hint that Sarnecki harassed other female employees (in fact no evidence even deals with whether there were or are other female employees at the Polish school). But it is beyond dispute that Sarnecki's actions were sexual in nature. In contrast to Galloway, where the Court of Appeals expressly found that defendant's actions were not gender-oriented, here a rehearsal of the evidence shows that the question can really be posed in the opposite direction from that required for Academy to succeed on its Rule 56 motion: Is there any real doubt that Sarnecki's treatment of Walko based as it was on his "sexual desire, [wa]s sexually motivated" (King v. Bd. of Regents of Univ. of Wis. Sys., 898 F.2d 533, 539 (7th Cir. 1990))?

It will be recalled that Sarnecki persistently tried to induce Walko to engage in sexual relations with him: He followed her, watched her, implored her to love him, suggested they "engage in sexual relations" and sent her love letters, electronic mail and voice messages to express his desire for a physical relationship with her (W. Add. St. ¶12). When that failed, Sarnecki threatened not only Walko's job but also her green card if she did not succumb to his demands (id. ¶15). Under those circumstances it would frankly be astonishing if a

finder of fact would not find Walko the victim of prohibited sexual harassment. It is really an understatement, then, to say that Academy is not entitled to summary judgment on Walko's sexual harassment claims.

## Retaliation

Walko has also brought a claim for retaliation, apparently choosing the direct method to prove her claim. To travel that route Walko must present evidence that (1) she engaged in a statutorily protected activity, (2) her employer took an adverse action against her and (3) there is a causal connection between the two (Rhodes, 359 F.3d at 508). One example of "statutorily protected expression" is "oppos[ing] any practice made an unlawful employment practice" by Title VII, such as sexual harassment (42 U.S.C. §2000e-3(a)).

Academy's summary judgment motion on this claim contests only the first factor, arguing in one short paragraph that Walko cannot recover on her retaliation claim because she cannot show that she was sexually harassed (A. Mem. 7). Over and above the rejection of that position in the preceding section of this opinion, Fine v. Ryan Int'l Airlines, 305 F.3d 746, 752 (7th Cir. 2002)(citations omitted) teaches:

> We have repeatedly held that a plaintiff need not prevail on her Title VII discriminatory claim or have opposed an action that in fact violated Title VII to win on a retaliation claim. All that is required is that "she reasonably believed in good faith that the practice she opposed

18

violated Title VII."[18]

Thus even if this opinion had found Walko was not sexually harassed as a matter of law (which it did not), the evidentiary record and the previous discussion show at a minimum that Walko has raised an issue of material fact as to whether she had a "good faith, reasonable belief" that she was the victim of sexual harassment: Sarnecki repeatedly implored her to have a sexual relationship with him and threatened her job and immigration status if she refused (see, e.g., Lipphardt, 267 F.3d at 1189). Academy's motion for summary judgment on Walko's retaliation claim is also denied.

## Conclusion

Academy has staked all its chips on Galloway (and now two other cases that it says point in the same direction), but the roulette wheels of sexual harassment and of retaliation have not stopped at that slot on either wheel. As for Walko's sexual harassment claim, Academy's motion fails to appreciate the

---

[18] Fine, 305 F.3d at 752 (citation omitted) went on to explain:

> It is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is "completely groundless." But a groundless claim is one resting on facts that no reasonable person possibly could have construed as a case of discrimination. Many claims might appear legitimate on the surface, but after discovery and a harder look at the full picture, they turn out ultimately to lack merit. Under Title VII, a person may not be terminated for making such a grounded, yet unsuccessful, complaint.

19

nuanced way in which a previous relationship may play into the sexual harassment paradigm. And Academy again misapprehends the import of a prior relationship on the law of retaliation. Because Walko has shown far more than the existence of a genuine issue of material fact as to both claims, Academy's Rule 56 motion is denied in its entirety. This action is set for a status hearing at 8:45 a.m. February 10, 2006 to discuss the procedures and timing to bring the case to trial.

                                 _____
                                 Milton I. Shadur
                                 Senior United States District Judge

Date:   January 31, 2006